Pryor, Appellant, *v.* Graff.

Argued October 7, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*H. Somerson,* with him *Elliott M. Winer,* and *Winer, Einhorn & Somerson,* for appellant.

*John J. McDevitt, 3rd,* with him *Peter P. Liebert, 3rd,* for appellee.

OPINION BY ERVIN, J., November 16, 1955:

This appeal is from the refusal of the court below to grant plaintiff's motion for a new trial after a verdict in his favor.

On May 29, 1950 the plaintiff was injured in an automobile accident which occurred on the Admiral Wilson Boulevard, Camden, New Jersey, when the 1950 Ford two-door sedan being driven by the plaintiff, which was halted in a line of traffic, was struck in the rear by an automobile driven by the defendant. As a result of the collision plaintiff was catapulted from the driver's seat into the rear of his automobile. Defendant admitted liability for the accident at the outset of the trial and the trial was thus limited to the issue of damages. Despite the admission of liability the trial lasted four days during which time extensive medical testimony was introduced by both plaintiff and defendant, comprising over 400 pages in the printed record submitted to us. The case was tried before a judge and jury resulting in a verdict for the plaintiff in the amount of $1,000.00. Plaintiff's motion for a new trial was refused and judgment was entered on the verdict. On appeal plaintiff alleges the court below should have granted his motion for a new trial (1) because of inadequacy of the verdict; and (2) because

the court erred in a portion of its charge relating to the measure of damages.

The refusal of a new trial because of alleged inadequacy of the verdict is a matter peculiarly within the discretion of the trial court, and the appellate court will not reverse unless the verdict is so unreasonable as to bring a conviction that it was influenced by partiality, passion or prejudice, or by some misconception of the law or evidence in the case. *Mohler, Admrx. v. Worley, Admrx.,* 179 Pa. Superior Ct. 56, 116 A. 2d 342. There is no claim of partiality, prejudice or passion on the part of the jury in this appeal. Appellant contends, in effect, there was a misconception of the evidence.

At the time of the accident on May 29, 1950 the plaintiff was 41 years of age and was employed by the Chicago Pneumatic Tool Company which is engaged in the business of manufacturing and selling automatic tools used in the repair of automobiles. Plaintiff had been employed by the company as a salesman on a six-months trial basis on September 15, 1949. On March 15, 1950 he had completed a course of training for his work as salesman during which he had been paid a straight salary of $250.00 per month. After the completion of his training period he was paid a base salary of $150.00 per month plus 5% commission on all sales in his territory. He had assumed his duties as a salesman approximately two months prior to the accident. His original territory included Eastern Pennsylvania (east of Altoona), New Jersey (south of Trenton) and all of Delaware. On May 15, 1950, two weeks before the accident, the State of Maryland was added to his territory.

Although plaintiff testified that after the impact he had a "terrific throbbing in the back of my head

and on top" and that his leg pained him he was able to fix up the seat of his car and drive it to his home in Philadelphia. After he reached his home he testified the throbbing in his head got worse and his knee started paining him so he had his wife call Dr. Freedman, the family doctor, who gave him some sedatives and ordered him to bed. Dr. Freedman treated him at home for two weeks and then later at his office. Dr. Freedman also had X-rays taken which were negative. Plaintiff remained in bed one week and was away from his employment for a total of four and one-half weeks. Dr. Freedman gave plaintiff eleven treatments. Later, plaintiff consulted Dr. Raymond Bailey, who gave him osteopathic treatments during the period from August to December, 1950. In the meantime the plaintiff had returned to work on a full time basis though he did lose six days of work from the time he resumed full time work to the end of the year. Shortly after the accident and prior to his resumption of work on a full time basis plaintiff's sales territory was expanded to include Washington, D. C. and the State of Virginia. His earnings immediately following the accident were shown to have been: 1950-June-$317.46; July-$231.08; August-$350.28; September-377.80; October-$215.95; November-$319.78.

Although the injury to his right leg and knee, about which he complained immediately following the accident, ultimately cleared up, the plaintiff at the trial attempted to prove that he had suffered a herniated intervertebral disc.

No medical evidence was introduced as to plaintiff's condition for the period from May 29, 1950, the date of the accident, to April, 1951, almost a year later. The medical evidence introduced to support his claim of an injured or impaired intervertebral disc began with the testimony of Dr. Louis Kaplan, Chief of Sur-

gical Service at the Albert Einstein Medical Center, Southern Division, and Clinical Professor of Surgery at the Hahnemann Medical College, who saw plaintiff at the request of his attorneys in April 1951, after a period of from three to four months during which plaintiff had no medical attention. The history obtained by Dr. Kaplan records plaintiff's complaint as follows: "He complains of pressure feeling on base of neck, mostly on left side, some on right side. Motion of left arm causes pain and feeling of binding at back of left shoulder. Somewhat similar trouble with right arm. After accident right arm cleared up after four months. Left arm unchanged. Some soreness of right leg for 6 weeks after accident, was hooked under dash." Dr. Kaplan found that the leg no longer bothered plaintiff. As the result of his physical examination Dr. Kaplan found: "There was no visible deformity; motion was full. Slight discomfort on motion of left arm. The muscles of the left side of neck were tender. There was diminished pain sensation from the middle of the left upper arm down to and including the fingertips." Dr. Kaplan's diagnosis was: "This patient's symptoms appeared to be due to a fibro-myositis on the left side of the neck, probably associated with some irritation of the brachial plexus, which is a group of nerves in the neck going down into the arm." The brachial plexus were described as "a group of nerves which leave the spinal column in the neck and go down into the arm. They are the nerves that are responsible for feeling in the arm and for motion in the arm." The function of the brachial plexus was described as follows: "These nerves are responsible for sensation in the arm, the sense of feeling in the arm. They are also responsible for the muscle motion of the arm, forearm and hand." From his first visit on April 16, 1951 until the end of 1951 Dr. Kaplan treated plaintiff with novocain injec-

tions and recommended that plaintiff massage the affected area at home. Although X-ray examination of the cervical spine made at Dr. Kaplan's request on April 26, 1951 proved negative, Dr. Kaplan testified that since the plaintiff's symptoms had increased while under his care he felt plaintiff should have additional examinations and a consultation with another physician. Dr. Kaplan then referred plaintiff to Dr. Abraham Myers, an orthopedic surgeon, who had further X-ray studies made on January 12, 1952. These X-rays were reported to show "definite evidence of trouble in the cervical spine." The radiologist's report was that there was a "flattening of the normal curve in the spine, and partial dislocation of one vertebrae on another when the neck was bent." Dr. Kaplan then had plaintiff admitted to the Mt. Sinai Hospital where traction was applied. The plaintiff remained in traction during his stay of seven days at the hospital. Following this treatment a cervical neck brace was prescribed for the plaintiff which he testified he wore about 75% of the time. The last time Dr. Kaplan saw plaintiff was on March 15, 1952, at which time he gave him another novocain injection.

The X-rays initially requested by Dr. Kaplan were taken on April 24, 1951 by Dr. Harold J. Isard, director of the Department of Radiology, Southern Division, Albert Einstein Medical Center. Dr. Isard testified there was no evidence of any abnormality in the cervical spine found in these X-rays. On January 11, 1952 Dr. Isard again took X-rays and found there was some flattening of the normal curve of the cervical spine. This curve is known as the lordotic curve. Dr. Isard testified: "We obtained the normal lordotic curve when the patient throws his neck back. This is the normal curve with the neck back. However, when we put the patient in flexion with the chin resting on his

—front part of his chest—we note now for the first time that the body of the 5th segment has slipped forward on the body of the 6th segment. . . . That is what we refer to as subluxation of the cervical spine. That was on January 11, 1952. We noted that time a subluxation of C-5—cervical 5 upon C-6." Dr. Isard testified further that X-rays on April 11, 1952 and May 15, 1953 also showed evidence of subluxation of the 5th cervical segment on the 6th cervical segment.

Dr. Abraham Myers, the orthopedic surgeon to whom the plaintiff had been referred originally by Dr. Kaplan, testified that he examined the plaintiff four times—in January, 1952, April, 1952, May, 1953 and October, 1953. His diagnosis was that the plaintiff "has a recession of an intervertebral disc of the neck— between C-5 and C-6, with dislocation of the 5th vertebral body." In further explanation he testified: "Dislocation, or subluxation, is the same thing, slipping of C-5, the fifth vertebral body, on the 6th." However, Dr. Myers testified on cross-examination that the slipping of the disc was demonstrated on the four sets of X-rays that he saw which had been taken by Dr. Isard. Dr. Myers specifically stated that the X-ray plates of April 24, 1951 demonstrated the slippage, which is in direct contradiction of the testimony of Dr. Isard who took the X-rays and who testified the plates of April 24, 1951 showed "no evidence of abnormality." Moreover, Dr. Myers indicated the slippage could be seen even in X-rays taken when the plaintiff was in a normal position but Dr. Isard testified the subluxation showed on the plates only when the neck was X-rayed in a flexed position.

Several months after his last consultation with Dr. Kaplan the plaintiff placed himself under the care of Dr. John Royal Moore and his associates at Temple University Hospital. In July, 1952 the plaintiff was

examined by Dr. Michael Scott, professor and head of the Department of Neurosurgery at Temple University Hospital and Medical School. Dr. Scott testified as to his findings: "My opinion was evidence of nerve root irritation on the left side, with the main changes—with the main sensory changes at the fourth and fifth cervical; and the main motor loss—by motor loss I meant the weakness in the movement of the fingers, and the grip—at the level of C-6, C-7 and C-8." He also stated: ". . . this patient might have multiple herniated discs and a pantopaque myelogram is definitely indicated." The myelogram was later conducted under Dr. Scott's supervision and the finding was entirely normal. In this connection Dr. Scott testified: "When we put this material in and carried it through the area of the spine that we suspected, we found no evidence of anything sticking out there or anything unusual." Dr. Scott further testified that the customary chemical analysis of the cerebrospinal fluid indicated a moderate elevation in the spinal fluid protein. Dr. Scott examined plaintiff on March 4, 1952, February 9, 1953, May 12, 1953 and October 13, 1953. In his opinion plaintiff "has had what is known as a whip-lash injury to the cervical spine with irritation of the nerve roots in the cervical area, and with a *probable intermittent cervical disc herniation.*" (Emphasis added) Under cross-examination Dr. Scott admitted that no X-ray disclosed any change in vertebrae or vertebral spaces indicating any compression or change in formation of cervical discs. He also admitted there was nothing he had found *other than plaintiff's own history and reports of pain* that would indicate plaintiff's cervical vertebrae had slipped out of position.

Dr. Arthur F. Seifer, an associate in the Department of Orthopedics at Temple University Hospital, also testified for the plaintiff and he stated: "In my

opinion the diagnosis of this case, the only way I could explain the clinical picture from the history, is a recurrent herniated intervertebral disc." However, Dr. Seifer's testimony concerning a disc pathology was completely refuted by his own report which was made on September 23, 1953, a month prior to trial, wherein he stated: "Intensive studies have not revealed disc herniation. X-rays were negative for bone or joint disease. The exact diagnosis is difficult in this case."

The jury, at the conclusion of the testimony of these witnesses, might well have been somewhat confused by the lack of objective findings and the inconsistencies in the testimony of plaintiff's expert medical witnesses.

The defendant also presented an equally imposing array of expert medical witnesses. The first medical witness for the defendant was Dr. Morton Kravitz, a graduate of Jefferson Medical College, who examined the plaintiff shortly after the accident. Plaintiff told Dr. Kravitz that he "wrenched his neck." X-rays taken on June 1, 1950 by Dr. Widmann were reported negative for fracture or dislocation. Dr. Kravitz diagnosed plaintiff's injury as "sprain of the neck and right knee, abrasions of right lower leg, and contusion of the head." He estimated total disability at five weeks and partial disability for an additional two weeks.

Dr. A. M. Ornsteen, a specialist in neurology and psychiatry, testified he examined the plaintiff on April 12, 1952 and again on April 11, 1953. At length he related the details of his examination and the nature of plaintiff's complaints as to limitation of motion of the head, sore muscle on the left side of the neck and partial loss of sensation in two fingers of left hand. He considered the X-ray reports of Dr. Widmann, Dr. Isard and Dr. Post who testified for the defendant. Based on his findings and the X-ray reports, Dr. Orn-

steen testified that plaintiff sprained his neck and his neurological examination "did not permit serious consideration of a rupture of any one of the discs between vertebrae and its being dislocated into the spinal column to press on any of the nerve roots in the spinal canal."

Dr. Joseph W. Post, a radiologist since 1914, was called as a witness for the defendant. Dr. Post had X-rayed plaintiff on two occasions—May 28, 1952 and April 11, 1953. Dr. Post found no sign of anything abnormal in his X-ray findings. An important feature of Dr. Post's testimony was his report of his examination of the X-ray plates from which Dr. Isard testified he had found disc pathology. After examination of these plates, Dr. Post was asked: "Q. And what is your reading of these particular films? A. That I would expect to find in a normal, flexed cervical spine."

Dr. Gustav C. Bird, Jr., who had taken the X-rays of plaintiff while he was at Temple University Hospital, testified for the defendant. Dr. Bird had X-rayed plaintiff on July 24, 1952, July 25, 1952, July 28, 1952 and September 1, 1953. These plates were taken in flexion and Dr. Bird testified: "Q. Now, with respect to disc spaces you find what? A. That the spaces between the vertebral bodies are of normal stature. Q. Now, finally, after X-rays on four different occasions, one of which was a myelogram, did you find any evidence of an abnormal lordotic curve or a spinal curve? A. No. Q. And did you find any evidence on any of your examinations of a subluxation or slipping of C-5 on C-6, or on any other vertebra? A. No." He testified: ". . . the studies are all entirely negative referable to the cervical spine."

Defendant's last medical witness was Dr. Luke W. Jordan, an orthopedic surgeon who examined plaintiff on April 9, 1952 and April 11, 1953. He testified he

could not substantiate plaintiff's complaints by objective findings.

In view of the contradictions in the testimony of plaintiff's medical witnesses and the serious conflict in the conclusions of the well-qualified expert medical witnesses for the plaintiff and the defendant, the determination by the jury of the nature, extent and probable duration of the injuries received by the plaintiff in the accident occurring on May 29, 1950 became a matter of credibility. It is axiomatic that the credibility of witnesses lies strictly within the sole province of the jury. In this case the jury by its verdict obviously rejected the plaintiff's claim that he had incurred a permanent injury to his cervical spine and chose to accept defendant's version that the injuries plaintiff admittedly sustained were minor in nature and disabled him for a short period. Moreover, it is not unreasonable to assume the jury took into consideration the fact that plaintiff was absent from his work only four and one-half weeks and that the time he lost from work after his return to full employment was for the purpose of taking treatments and not because he was actually unable to work because of his alleged pain and suffering. Furthermore, other factors the jury must have considered were pointed out by the court below as follows: "One factor the jury must have considered was this plaintiff's ability to continue covering a territory of several states driving an automobile while wearing a neck brace. Another significant factor was the failure to have the doctors who originally treated plaintiff testify. . . . Plaintiff testified to his inability to demonstrate tools and other restricted movements of his neck. Yet, the jury saw motion pictures of plaintiff which seriously impeached this testimony."

The jury returned a verdict for the plaintiff in the amount of $1,000.00 which was approximately $22.00

in excess of the medical bills incurred by plaintiff beginning with his visit to Dr. Kaplan in April, 1951 about a year after the accident. Appellant argues the court below should have regarded this verdict as grossly inadequate and granted a new trial because the verdict gave plaintiff nothing for his loss of earnings, impaired earning power in the future, and for his pain and suffering. However, this contention ignores the practical effect of the jury's verdict. As stated by the court below: ". . . they [the jury] chose not to accept plaintiff's version of his injury and the extent thereof, and therefore, concluded that he did not bear the expenses as a result of the accident." There was no proof of medical expenses incurred immediately after the accident and the testimony discloses the plaintiff continued to receive his salary of $150.00 per month and commissions subsequent to the accident. The jury's verdict of $1,000.00 under the circumstances can only be viewed as their estimate of the probable loss of earnings during the relatively short period plaintiff was incapacitated or their estimate of the pain and suffering he incurred as the result of the minor injury he sustained or a combination of both. "If the verdict bears a reasonable resemblance to damages which were proven, it is not the function of this Court to substitute its judgment for that of the jury." *Perzak v. Coulter*, 171 Pa. Superior Ct. 475, 478, 479, 90 A. 2d 256.

Appellant also contends the trial judge erred in a portion of his charge by allegedly excluding any consideration by the jury of the elements of damage in the event they found the plaintiff suffered an injury which was of shorter duration than that claimed by plaintiff. Plaintiff took no exception to the alleged erroneous instruction nor did he assign it as error in his motion for a new trial and therefore it is not properly before us

for consideration. *Mawhinney v. Holtzhauer,* 168 Pa. Superior Ct. 283, 286, 77 A. 2d 734. However, we have reviewed the charge in its entirety and find the trial judge properly instructed the jury to determine the amount of damages regardless of the kind of injury the plaintiff sustained and the extent of its duration.

After a careful review of all the evidence contained in the voluminous record we are convinced the court below committed no error in refusing a new trial.

Judgment is affirmed.